# In the United States Court of Federal Claims

No. 11-682 C

(Filed February 25, 2014)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| ENSLEY, INC., | \* |
| | \* |
| *Plaintiff*, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| *Defendant*. | \* |

Contract; Breach and Setoff;
Setoff of Repair Costs against
Rent and Tax Payments Owed
under Postal Service Lease.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Lawrence M. Magdovitz, II*, Cordova, TN, for plaintiff.

*Matthew P. Roche*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, and *Martin F. Hockey, Jr.*, Assistant Director, Washington, DC, for defendant.

_____

**OPINION**

_____

**BUSH**, *Senior Judge*.

Now pending before the court is defendant's motion for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Defendant's motion has been fully briefed and is ripe for a decision by the court. Oral argument was neither requested by the parties nor required by the court. For the reasons set forth below, the court grants defendant's motion.

# BACKGROUND[1]

## I.     Factual Background

### A.     Lawrence Magdovitz and Ensley Station

During the time period relevant to this litigation, Lawrence Magdovitz, an attorney, realtor, and residential contractor in Clarksdale, Mississippi, owned and/or controlled several corporations which together own hundreds of properties that are leased to the United States Postal Service (the Postal Service), including the property which is the subject of this litigation.  A117-18, 122, 127-28, 130-36.[2] That property, which is located at 700 18th Street in Birmingham, Alabama, and which the parties refer to as "Ensley Station," has been leased to the Postal Service since 1965 for use as a post office.  Compl. ¶ 2; *see* Def.'s Mot. at 2; Pl.'s Resp. at 1.

In February 2000, Kerin Motors, Inc. (Kerin Motors), which until December 2012 was owned either in whole or in part by Mr. Magdovitz, purchased Ensley Station.  A122-23, 127-28.  That conveyance included a lease with the Postal Service dated March 15, 1965.[3]  A7-18 (lease agreement with amendments).

Mr. Magdovitz incorporated Ensley, Inc. (Ensley), the plaintiff in the instant case, in 2005.  A137.  Mr. Magdovitz is the president of Ensley.  A136.  The sole shareholders of Ensley are Lawrence M. Magdovitz, III and Noah Connor

---

[1]/ The facts recounted in this opinion are taken from the complaint and the parties' submissions in connection with defendant's motion for summary judgment.  Except where otherwise noted, the facts recounted herein are undisputed.

[2]/ All references in this opinion to "A____" are to the appendix to defendant's motion for summary judgment.

[3]/ Although a "Certificate of Transfer of Title to Leased Property and Lease Assignment and Assumption" dated July 17, 2005 refers to the lease as "dated March 20, 1965," A159, the lease itself states that it was "made and entered into this []15[th] day of March, 1965," A7, and a subsequent amendment to the lease likewise refers to the lease as an "instrument dated March 15, 1965," A16.  Despite this discrepancy, the precise date on which the lease was entered is not material to the court's resolution of defendant's motion for summary judgment.

Magdovitz – Mr. Magdovitz's grandsons.  A133.  On July 17, 2005, Kerin Motors conveyed Ensley Station, and assigned the lease, to Ensley.  A137, 159.

### B.   The Lease

The lease contains two provisions which set forth the lessor's obligation to maintain the premises as well as the tenant's rights in the event that the lessor fails to fulfill that obligation.  Specifically, paragraph 7 of the lease states, in pertinent part, that "[t]he Lessor shall . . . maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, whether severable or non-severable, . . . in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees."  A8.  Additionally, paragraph 10(c) of the lease provides as follows:

> If any building or any part of it on the leased property becomes unfit for use for the purposes leased, the lessor shall put the same in a satisfactory condition, as determined by the Post Office Department, for the purposes leased.  If the lessor does not do so with reasonable diligence, the Post Office Department in its discretion may cancel the lease.  For any period said building or any part thereof is unfit for the purposes leased, the rent shall be abated in proportion to the area determined by the Post Office Department to have been rendered unavailable to the Post Office Department by reason of such condition.

*Id.*

The lease also contains a "Tax Clause Rider" (the Tax Clause), which provides in pertinent part as follows:

> The lessor shall present to the Government the general real estate bills of each taxing authority for taxes due and payable on the land and buildings hereby demised when said taxes apply to any year or part thereof within the term of this lease. . . .  After the presentation of said tax

3

> bills, the Government shall pay to the lessor, as
> additional rent due hereunder, the net amount of said
> taxes by check made payable to the lessor and the taxing
> authority issuing said tax bill.  The lessor shall thereafter
> promptly indorse said check and turn the same over to
> the said taxing authority.

A16.

## C.    The Leaky Roof at Ensley Station

In the fall of 2002, shortly after Kerin Motors had purchased Ensley Station and assumed the lease with the Postal Service, the roof at Ensley Station experienced leaks.  *See* Pl.'s Statement of Undisputed Material Facts (PSUMF) ¶ 8. On October 7, 2002, Kenneth Means, the manager of Ensley Station, notified Mr. Magdovitz in writing that Ensley Station "HAS LEAKS ON THE ROOF IN . . . TWO DIFFERENT PLACES" and emphasized that "IMMEDIATE ATTENTION IS NEEDED AS SOON AS POSSIBLE."  A29.  In response, Mr. Magdovitz sent Joe Spencer, a plumber by trade who also performed various odd jobs for Mr. Magdovitz, to repair the roof.[4]  A141-42, 146-47.

Despite Mr. Spencer's efforts, the roof continued to leak.  On March 21, 2003, Mr. Means again notified Mr. Magdovitz that "Ensley [S]tation has roof leaks that need to be looked at."  A30.  In response, Mr. Magdovitz sent Mr. Spencer to Ensley Station to repair the roof a second time.  A31; Pl.'s Resp. Ex. 3 (Magdovitz Dep. pt. 1) at 77-79.[5]  This second effort was similarly unfruitful,

---

[4]/ Although Mr. Magdovitz asserted at his deposition that Mr. Spencer "had an electrical and plumbing license," he stated that he did not know whether Mr. Spencer possessed a roofing license.  A141-42.  In the totality of the testimony concerning Mr. Spencer, there is nothing indicating that he was a licensed roofer or, for that matter, that he possessed any roofing experience whatsoever.

[5]/ Defendant's appendix includes a redacted version of the transcript of Mr. Magdovitz's deposition.  Because the pertinent testimony in Mr. Magdovitz's deposition is not confined to the page ranges included in defendant's appendix, the court is obliged to refer in certain portions of this opinion to the un-redacted transcript of Mr. Magdovitz's deposition attached as an exhibit to plaintiff's response to defendant's motion for summary judgment.

however.  On April 23, 2003, Mr. Means wrote to Mr. Magdovitz yet again to notify him that "THE BUILDING STILL HAS LEAKS ON THE ROOF IN . . . TWO DIFFERENT PLACES."  A32.  Mr. Means added that Mr. Spencer's "LAST VISIT DID NOT CORRECT THE PROBLEM," and that "WE HAVE LEAKS IN THE SAFE ROOM AND [IN THE] WOMEN[']S BATHROOM."  *Id.*

The roof continued to leak in 2004 and 2005.  *See* A38-52.  On September 1, 2004, the Postal Service sent a letter to Mr. Magdovitz to "follow up [on] several calls . . . [in] the past several months . . . regarding . . . need[ed] repairs at the Birmingham Ensley Station post office facility."  A38.  Among the "need[ed] repairs" listed in the letter were "[r]epair roof leaks" and "[r]eplace ceiling tiles stained from roof leaks."  *Id.*; *see* PSUMF ¶ 11.  The letter concluded by stating that "[s]hould [Kerin Motors] not take action to make the required repairs by September 24, [2004,] the Postal Service will solicit proposals and award a contract to have the work completed by a third party" and would seek to recover the costs of such repairs "from rents due . . . under the terms and conditions of the lease."  A38.  On January 13, 2005, the Postal Service sent yet another letter to Mr. Magdovitz concerning "outstanding deferred maintenance items" at various post office locations, including Ensley Station.  A39-40.  Regarding the leaky roof at Ensley Station, the letter stated that an "attempt [had been] made to repair leaks" on October 11, 2004, but that leaks were "STILL IN EVIDENCE" – *i.e.*, "RAIN IS STILL COMING IN," "CEILING TILES ARE FALLING," and "FUNGUS [IS] NOTED IN SOME AREAS."  A40.

In response to the Postal Service's persistent complaints, Mr. Magdovitz sent William Willis, the superintendent of operations for the Yazoo, Mississippi Delta Levee Board who also performed various weekend projects for Mr. Magdovitz, to repair the roof.[6]  A49-52; Pl.'s Resp. Ex.  4 (Magdovitz Dep. pt. 2) at 107-08, 114-16.  Mr. Willis visited Ensley Station twice to conduct repairs.  A187-88; PSUMF ¶¶ 12-13.  During his initial visit in or about March 2005, Mr. Willis spent approximately two hours replacing water-damaged ceiling tiles inside

---

[6]/  Like Mr. Spencer, Mr. Willis was not a licensed roofer.  Mr. Willis testified that his job as operations superintendent entailed the performance of maintenance and repair work on the Yazoo, Mississippi Delta Levee.  Although he admitted that he possessed no professional certifications, he claimed that he had obtained "[h]ands-on training" in sundry areas such as "heavy equipment, welding, carpentry work, [and] roofing."  A161-62.

the building, applying concrete silicone to cracks around vents on the roof and to cracks in the building's external walls near the roof, and applying plastic cement to cracks along the flashing of an overhang on the front of the building.  A169-75.

Despite the repairs performed by Mr. Willis, the roof at Ensley Station continued to leak.  *See* A42-48.  In an effort to stop the leaks, the Postal Service's maintenance personnel placed a plastic tarp over approximately one-third of the roof and secured it with 3/8 inch staples.  Compl. ¶ 11; A56.  Later in March 2005, Mr. Magdovitz sent Mr. Willis a second time to Ensley Station to perform additional repairs to the roof.  A152, 179-84.  During that visit, Mr. Willis discovered the tarp on the roof, removed it, and applied a layer of aluminum roof coating called "silver coat" over the surface of the roof.  A182-84, 187-88; PSUMF ¶¶ 14, 17-18.  Mr. Willis did not inspect the subsurface of the roof before applying the coating, nor did he verify whether the staples had actually punctured the subsurface.  A181-82.

The roof at Ensley Station continued to leak through the end of March 2005 and into April 2005.  A47-48, 74.  On April 4, 2005, Bryan Pease, the Real Estate Manager for the Postal Service's Southeast Facilities Service Office, sent a letter to "Larry" Magdovitz – Mr. Magdovitz's son and attorney – stating that Ensley Station "has the attention of the District Manager" because workers at the station were "complaining about having to work in wet conditions every time it rains." A56-57.  Mr. Pease also stated that the Postal Service was "having a roofing consultant examine the roof and provide us with an existing conditions survey and recommendation for repair/replacement."  *Id.*

## D.    The House Report

On April 18, 2005, Charles House, an expert in commercial and residential roofing systems and a registered roof observer for Thompson Engineering Inc., inspected Ensley Station's roof and conducted a moisture survey.  A58, 61-64, 66. In his written report of the inspection, Mr. House noted that the roof consisted of "multiple layers of a granulated modified bitumen surface material," most likely a material called "Ruberoid."  A59; *see also* A66.  Mr. House also stated that, during his inspection, he conducted a moisture survey of the roof using a "Tramex Leak Seeker non-destructive moisture detection system."  A67.  Mr. House explained that "[t]he Leak Seeker is a solid state electronic capacitance meter especially

designed to locate trapped moisture in a roof system." *Id.*  According to Mr. House, the moisture survey revealed "extremely high" levels of moisture "under the roof membrane in all locations throughout the entire roof area with heavy concentrations at the perimeter and locations around the metal flashing collars." A66-67.

In addition, Mr. House observed that the "side laps" and "end laps" of the granulated modified bitumen surface material had been taped over and/or adhered to the roof membrane using roof cement.  A67, 69, 72.  This condition, Mr. House concluded, is indicative of "[p]oor sealing" of the surface material as well as "past roof leaks."  A67; *see also* A69 ("Taping of the side laps would indicate separation of the laps in the past."), 72 ("The end laps of the modified cap sheet are also being sealed with roof cement prior to the application of the new top coating.  This form of cement application is indicative of past roof leak problems.").  Mr. House also noted that only seventy percent of the surface material was "turned down over the existing perimeter metal drip edge and nailed," while the remaining thirty percent "terminated at the edge of the [perimeter] metal and turned slightly upward."  A67; *see also* A73.  Mr. House opined that this condition resulted in "water accumulat[ing] on the roof surface . . . [and] run[ning] over the raised edge of the modified sheet and into the roof system underneath."  A67; *see also* A70 ("In areas where the cap sheet was not turned down over the drip edge water was running back under the cap into the roof."), 73 ("When water builds up on the roof surface it runs over the outside edge of the cap and back under the open edge at the [perimeter] metal.  This condition allows a large amount of water into the roof system.").  Additionally, Mr. House observed that the "metal flashing collars installed to seal the penetration of the plumbing metal vents" on the roof "were not sealed properly and were allowing water into the roof system."  A67; *see also* A71. Finally, Mr. House noted that "[t]he metal drip edge has been moving at the end lap joints due to poor nailing," a condition which, in Mr. House's opinion, "cause[d] the membrane stripping to split and allow[ed] water to enter the [roof] system at the perimeter."  A67; *see also* A72.

Based upon the results of the moisture survey and his observations regarding the condition of the roof system, Mr. House concluded that "moisture has been entering the roof system and building for some time" and that "[t]he concentration of moisture is so large [that] a process of deterioration has begun that cannot be stopped."  A67-68.  Mr. House therefore recommended that "[t]he only solution to

this problem would be [the] complete removal of the roof membrane, roof insulation, and perimeter metal. . . .  [d]own to the roof deck" as well as replacement of the entire roof system.  A68.

### E.    The Postal Service Replaces the Roof and Offsets the Cost of Replacement against Rents Owed under the Lease

On April 27, 2005, Mr. Pease sent Mr. House's report to Mr. Magdovitz by facsimile along with a cover sheet stating that the "REPORT RECOMMENDS REPLACEMENT AS THE ONLY MEANS OF MAKING THE ROOF WATER TIGHT."  A74.  Mr. Pease requested that Mr. Magdovitz "ADVISE [THE POSTAL SERVICE] OF PLANNED ACTION AND SCHEDULE AS SOON AS POSSIBLE."  *Id.*  Mr. Magdovitz responded on May 11, 2005, asserting that "[t]he roof at Ensley [Station] is not leaking" and "[i]f water is trapped under the roofing, it was caused by the thousands of staples penetrating the roof caused by [Postal Service] employees."  A83.

On May 20, 2005, Mr. Pease sent another letter to Mr. Magdovitz stating that the Postal Service would "proceed to have the roof replaced as soon as practicable" and would seek reimbursement of the cost of replacing the roof or, in the alternative, would "recapture [the cost] through rent reductions."  A84; *see* PSUMF ¶ 19.  On August 10, 2005, Mr. Pease sent yet another letter to Mr. Magdovitz stating that "the leaks are still in evidence" and reiterating that the Postal Service would complete the necessary repairs and seek to recover the cost of such repairs "from rents due you under the terms and conditions of the Lease." A86.

Shortly thereafter, the Postal Service entered into a contract for the replacement of the roof, which was completed on October 6, 2005 at a cost of $55,296.14.  Compl. ¶¶ 13-14; A90-106; PSUMF ¶ 20.  On December 13, 2005, Mr. Pease provided Mr. Magdovitz with copies of invoices for the roof replacement and informed him that if the Postal Service did not receive reimbursement by January 6, 2006, "the full cost of the roof replacement under this lease may be recouped through rental deduction."  A105; *see* PSUMF ¶ 22.

The Postal Service never received reimbursement of the cost of replacing the roof.  A109.  Accordingly, on October 15, 2010, contracting officer Jean Scholl

Berg issued a "final decision" authorizing the withholding of rent payments under the lease as a setoff.  A108-11; *see* PSUMF ¶ 21.  Ms. Berg's decision stated that, unless payment was made in the full amount of $55,296.14 by January 1, 2012, the Postal Service would begin to make monthly rent deductions beginning on that date and ending in March 2015, for a total deduction of $12,982.02.  A110.  The decision further stated that this would "leave[] a balance of $42,314.12[,] which will be deducted from any other payments due under the lease or, if necessary, collected through legal action."  *Id.*

On November 12, 2010, Ms. Berg sent another letter to Mr. Magdovitz acknowledging Ensley's request for payment of $3,410.77 in property taxes pursuant to the Tax Clause contained in the lease.  A112-13; *see* PSUMF ¶ 23. This letter stated that the Postal Service "will not pay the additional rent otherwise provided for in the Tax Clause," but would instead offset the tax payments requested by plaintiff against the cost of replacing the roof.  A112-13.

## II.   Procedural History

Ensley filed a three-count complaint in this court on October 14, 2011.  In Count I, plaintiff alleges that the government breached the lease by "improperly attempting to reimburse itself $55,296.14 for repairs to the roof" at Ensley Station. Compl. ¶ 23.  Plaintiff asserts that it "addressed the roof leak issues" and that the Postal Service "replaced the roof unnecessarily."  *Id.* ¶ 24.  Ensley also asserts, in the alternative, that any "continued leaks after the Plaintiff's repairs were the result of the 'acts or negligence' of the Defendant's agents or employees by making thousands of staple punctures to the roof."  *Id.* ¶ 25; *see also id.* ¶ 15.  With respect to Count I, plaintiff asks the court to "find that the Defendant breached the Lease Agreement by improperly charging and withholding from the rents the amount of $55,296.14" and to "order the Defendant to refund all funds withheld by the Defendant . . . [and] cease any future withholding."  *Id.* ¶ 28.

In Count II, plaintiff alleges that the government breached the lease by refusing to pay property taxes it allegedly owed pursuant to the Tax Clause. Compl. ¶¶ 29-34.  With respect to this count, Ensley "requests . . . that the Defendant be ordered to forward a check for the amount of the taxes, including any penalties, interest or other charges required to be paid."  *Id.* ¶ 34.

In Count III, plaintiff alleges that the government "has taken a substantially unjustifiable position in this matter . . . based on the fact that the Lease Agreement clearly states [that] the Defendant must provide payment of the real property taxes upon being presented with the tax bill for the Property." Compl. ¶ 36. Ensley asserts that "[t]he Defendant's actions were contrary to the facts presented to them in written correspondence from the Plaintiff and [in] the Lease Agreement and were done in bad faith." *Id.* ¶ 37. Plaintiff therefore requests "reasonable attorney's fees in an amount to be shown in an [Equal Access to Justice Act] application." *Id.* ¶ 40.

Defendant filed a motion for summary judgment on August 29, 2013. In its motion, defendant argues that there is no genuine issue of fact regarding plaintiff's failure to remedy the ongoing leaks in the Ensley Station roof, and that plaintiff can produce no evidence demonstrating that such leaks were attributable to the Postal Service's act of stapling a plastic tarp to the roof. *See* Def.'s Mot. at 12-16; Def.'s Reply at 9-12. Defendant therefore contends that plaintiff is responsible for the cost of replacing the roof under paragraphs 7 and 10(c) of the lease. In addition, defendant argues that the Postal Service is entitled to offset the cost of replacing the roof against rent due under the lease, including by withholding tax payments otherwise owed pursuant to the Tax Clause. *See* Def.'s Mot. at 11-12, 16-18; Def.'s Reply at 3-9, 12-14. Plaintiff filed its response on October 28, 2013, and defendant filed its reply on November 26, 2013.

## DISCUSSION

## I.    Standard of Review for RCFC 56 Motions for Summary Judgment

The availability of summary judgment helps a federal court "'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it would affect the outcome of the suit. *Anderson*, 477 U.S. at 248. A dispute of material fact is genuine if a reasonable trier of fact could return a verdict for the nonmoving party. *Id.* at 248, 256; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) (stating that there is no genuine issue

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

The moving party bears the burden of showing that there is an absence of any genuine issue of material fact, and the court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in favor of that party. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted). "The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact . . . ." *Id.* (citing *Celotex*, 477 U.S. at 325). Rather, "when the non-moving party bears the burden of proof on an issue, the moving party can simply point out the absence of evidence creating a disputed issue of material fact" and thereby shift the burden to the nonmoving party to produce evidence showing that there is such a disputed factual issue in the case. *Simanski v. Sec'y of Health & Human Servs.*, 671 F.3d 1368, 1379 (Fed. Cir. 2012) (citing *Celotex*, 477 U.S. at 325, and *Dairyland*, 16 F.3d at 1202).

A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Mere allegations or denials, conclusory statements, or evidence that is merely colorable or not significantly probative are not sufficient to preclude summary judgment. *Id.* at 248-50, 256; *see also Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citations omitted); *Applied Cos. v. United States*,144 F.3d 1470, 1475 (Fed. Cir. 1998) ("It is well settled that 'a conclusory statement on the ultimate issue does not create a genuine issue of fact.'" (quoting *Imperial Tobacco Ltd. v. Philip Morris, Inc.,* 899 F.2d 1575, 1581 (Fed. Cir. 1990))); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984) (*Barmag*) ("With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged. . . . Mere denials or conclusory statements are insufficient.") (citation omitted). "The party opposing the motion must point to an evidentiary conflict created on the record by at least a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag*, 731 F.2d at 836. Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and on which that party will

bear the burden of proof at trial. *Dairyland*, 16 F.3d at 1202 (citing *Celotex*, 477 U.S. at 323).

## II.     Analysis

### A.     Whether Ongoing Leaks at Ensley Station Were Attributable to Plaintiff or the Postal Service

The government argues that there is no genuine issue of fact regarding plaintiff's failure to repair ongoing leaks in the Ensley Station roof, and that plaintiff can produce no evidence demonstrating that the leaks were attributable to the Postal Service's act of stapling a plastic tarp to the roof. *See* Def.'s Mot. at 12-16; Def.'s Reply at 4-6, 9-12.  Defendant therefore contends that the Postal Service "reasonably concluded that Ensley had breached the lessor's obligations in paragraphs 7 and 10(c) of the lease by failing to keep the roof in good repair and tenable condition and by failing to put the roof 'in a satisfactory condition.'" Def.'s Reply at 4 (quoting lease paragraph 10(c) at A8); *see also* Def.'s Mot. at 16 ("Ensley cannot establish that the Government was responsible for the leaks or that the Postal Service's decision to replace the roof was unreasonable.").

Plaintiff responds that it "fulfilled its maintenance obligation to the Defendant when it repaired the roof on the leased property, but the Defendant's contractors put staple holes in the roof afterwards causing subsequent roof leaks." Pl.'s Resp. at 1.  Plaintiff therefore contends that "[t]here is a genuine issue of material fact as to the cause of the leaks at Ensley [Station]." *Id.* at 8; *see also id.* at 9 ("[T]here exists a genuine issue of material fact as to whether the Defendant contributed to the roof leaks by stapling plastic to the roof at Ensley thus causing new leaks.").

After careful consideration of the evidence and arguments presented by the parties, the court agrees with defendant that there is no genuine dispute of fact regarding plaintiff's failure to remedy the ongoing leaks in the Ensley Station roof. As a preliminary matter, the undisputed evidence demonstrates that leaks persisted from 2002 through 2005 despite the Postal Service's repeated complaints and Mr. Spencer's and Mr. Willis's numerous repair attempts.  The Postal Service first notified Mr. Magdovitz of the leaks in October 2002. A29; PSUMF ¶ 8.  Although Mr. Magdovitz sent Mr. Spencer to make repairs to the roof shortly thereafter, the

leaks reappeared in March 2003.  A30, 141-42, 146-47.  The Postal Service again complained of leaks in April 2003, even after Mr. Magdovitz sent Mr. Spencer a second time to repair the roof.  A31-32; Pl.'s Resp. App.  3 (Magdovitz Dep. pt. 1) at 77-79.  Complaints of roof leaks continued in 2004 and 2005, even after Mr. Magdovitz dispatched Mr. Willis twice to conduct repairs.  A38-57, 74; PSUMF ¶ 11.

Plaintiff concedes that "there were leaks" in the Ensley Station roof but nevertheless asserts that such leaks were "repaired" by Mr. Spencer and Mr. Willis, thereby fulfilling plaintiff's obligations under paragraphs 7 and 10(c) of the lease. *See* Pl.'s Resp. at 8; *see also id.* at 1 ("[T]he Plaintiff fulfilled its maintenance obligation to the Defendant when it repaired the roof on the leased property . . . ."). However, Ensley offers no evidence to support this claim, or to rebut the evidence demonstrating that the Ensley Station roof continued to leak despite Mr. Spencer's and Mr. Willis's efforts.  As noted *supra*, mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative are not sufficient to preclude summary judgment.  *See Anderson*, 477 U.S. at 248-50, 256; *Matsushita*, 475 U.S. at 586; *Barmag*, 731 F.2d at 835-36.  Under this binding authority, plaintiff's bald and unsupported assertion is plainly insufficient to demonstrate the existence of a genuine issue of material fact regarding plaintiff's failure to remedy the ongoing leaks at Ensley Station.

Furthermore, the court agrees with the government that plaintiff has not demonstrated a genuine issue of fact as to the cause of the leaks.  As noted above, the moisture survey conducted by Mr. House on April 18, 2005 revealed "extremely high" levels of moisture "under the roof membrane in all locations throughout the entire roof area."  A66-67.  Such high moisture levels, Mr. House concluded, signaled that water had been "entering the roof system and building *for some time.*"  A67 (emphasis added).  Additionally, Mr. House observed particularly high levels of moisture "at the perimeter [of the roof] and [in] locations around the metal flashing collars."  A66.  This condition, Mr. House concluded, resulted from improper sealing of metal drip edges and flashing collars, as well as improper installation and sealing of the granulated modified bitumen surface material overlaying the roof.  A67, 69-73.

Ensley offers nothing to challenge Mr. House's credentials as an expert, and proffers no rebuttal to Mr. House's findings and conclusions other than to assert

13

that they are "directly contrary" to the testimony provided by Mr. Willis.[7]  Pl.'s Resp. at 9.  Plaintiff relies specifically upon the portion of Mr. Willis's deposition testimony in which he stated that the surface material installed on the Ensley Station roof "is about a sixteenth of an inch thick" and "wo[uldn't] take a big staple to go through it," as well as his testimony that the roof "can't do nothing but leak" as a result of the 3/8 inch staples used by the Postal Service to secure the tarp to the roof.  A181; *see* Pl.'s Resp. at 9.  Ensley contends that this testimony demonstrates a "genuine issue of material fact as to whether and to what extent the Defendant is responsible for the roof leaks at Ensley [Station]" because "1/16th of an inch of roofing material is less than 3/8th of an inch of metal staple."  Pl.'s Resp. at 9.

Undercutting plaintiff's argument, however, are two factors.  The first is Mr. Willis's lack of credentials as even a licensed roofer, let alone as an expert in roofing.  The second consideration is Mr. Willis's own admission that he never inspected underneath the surface of the Ensley Station roof and therefore did not know the actual thickness of the roof or whether the staples had actually punctured the roof.  *See* A176, 181-82.  To preclude summary judgment, Ensley must do more than offer "[m]ere denials or conclusory statements"; it "must point to an evidentiary conflict created on the record by at least a counter statement of a fact or facts set forth in detail in an affidavit by a *knowledgeable* affiant."  *Barmag*, 731 F.2d at 836 (emphasis added).  Under this standard, Mr. Willis's purely speculative statement that the roof "can't do nothing but leak" as a result of the Postal Service's act of stapling a tarp to a portion of the roof cannot establish a genuine issue of fact regarding the cause of the leaks at Ensley Station.  Accordingly, the court agrees with defendant that "Ensley does not meaningfully dispute the findings and conclusions made by [Mr.] House regarding the roof's condition," and therefore plaintiff has failed to establish a genuine dispute of fact as to the cause of the ongoing leaks at Ensley Station as well as its failure to remedy those leaks.  *See* Def.'s Reply at 2.

---

[7]/  Although Mr. Willis was shown photographs taken by Mr. House during his April 18, 2005 investigation, he was not asked to offer any opinion as to Mr. House's findings and conclusions with respect to the condition of the roof.  *See* A185-86, 194-95.

**B.      Whether the Government Was Entitled to Replace the Roof and Offset the Cost of Replacement against Rents Owed Plaintiff under the Lease**

The government next argues that the Postal Service "was well within its rights [under the lease] to offset the amount that it owes [Ensley] in rents against the cost of the roof as a setoff."  Def.'s Mot. at 11; *see also* Def.'s Reply at 3-4, 7-9.  The court agrees, for the following reasons.

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (citation and internal quotation marks omitted).  "[S]etoff is a device that facilitates the efficient reconciliation of competing claims between the same parties."  *J.G.B. Enters., Inc. v. United States*, 497 F.3d 1259, 1261 (Fed. Cir. 2007) (citing *Strumpf*, 516 U.S. at 18).

The seminal case regarding the government's right of setoff is *United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234 (1947) (*Munsey*).  In *Munsey*, the government had retained percentages of progress payments owed to a contractor on six contracts.  332 U.S. 234, 237.  The contractor defaulted on a subsequent contract, resulting in damages to the government which the government offset against the retained progress payments.  *Id.*  In holding that the government properly exercised its right of setoff, the United States Supreme Court stated that "[t]he government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him."  *Id.* at 239 (citations and internal quotation marks omitted).

Following *Munsey*, the United States Court of Appeals for the Federal Circuit and its predecessor, the Court of Claims, "have repeatedly recognized the government's right of set-off" as a matter of federal common law.  *Johnson v. All-State Constr., Inc.*, 329 F.3d 848, 852 (Fed. Cir. 2003) (citing cases); *see also Applied Cos.*, 144 F.3d at 1476.  Under this precedent, the government's common law setoff rights can be defeated or constricted only by "explicit contractual, statutory, or regulatory language."  *J.G.B.*, 497 F.3d at 1261 (citing *Munsey*, 332 U.S. at 239, and *Applied Cos.*, 144 F.3d at 1476); *see also Johnson*, 329 F.3d at

15

853 (citations omitted); *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993).

Defendant points out that the lease contains no language expressly prohibiting the Postal Service from making repairs and deducting the cost of such repairs from rent due under the lease in the event of the lessor's failure to maintain the premises in accordance with paragraphs 7 and 10(c) of the lease. *See* Def.'s Mot. at 11 ("Here, the lease contains 'no prohibition against setoffs.'" (quoting *Applied Cos.*, 144 F.3d at 1476)). Defendant therefore contends that the lease does not constrict the government's common law setoff rights. *Id.* (citing *Applied Cos.*, 144 F.3d at 1476).

Applying the aforementioned authorities concerning the government's right of setoff, the court is compelled to agree with the government on the purely legal issue of the availability of setoff as a remedy for the lessor's failure to maintain the premises in accordance with paragraphs 7 and 10(c) of the lease. Although the parties frame this issue primarily as one of contract interpretation, the court notes preliminarily that the government's setoff rights are grounded in federal *common law*, not in the terms of any contract. As noted *supra*, it is well established that the government enjoys a right of setoff that can be defeated or constricted only by "explicit contractual, statutory, or regulatory language." *J.G.B.*, 497 F.3d at 1261 (citations omitted). And, as previously stated, the lease at issue in this case contains no language explicitly limiting the government's setoff rights, including the government's right to make repairs and to deduct the cost of such repairs from rent due under the lease.

Plaintiff nevertheless contends that the Postal Service was not entitled to replace the roof at Ensley Station and deduct the cost of replacement from rent due under the lease because paragraph 10(c) *implicitly* bars this remedy. *See* Pl.'s Resp. at 7-8. Specifically, plaintiff relies upon a portion of paragraph 10(c) which states that "[i]f any building or any part of it on the leased property becomes unfit for use for the purposes leased, the lessor shall put the same in a satisfactory condition," and "[i]f the lessor does not do so with reasonable diligence, the Post Office Department in its discretion may cancel the lease." A8; *see* Pl.'s Resp. at 7-8. Ensley argues that paragraph 10(c), by listing a particular remedy available to the Postal Service in the event of Ensley's breach (*i.e.*, cancellation), implicitly excludes all other remedies, including self-help repair and rent deduction. Pl.'s

Resp. at 7 (stating that paragraph 10(c) "is clear and unambiguous in providing the Defendant with one remedy for the failure of the lessor to make necessary repairs: cancel the lease"), 8 ("[T]he words of the Lease should be given the meaning derived from it by a reasonable intelligent person acquainted with the contemporaneous circumstances.  Using that plain meaning, the Defendant only had the option to cancel the Lease, not repair the roof and deduct the amount from the rents.") (citation omitted).[8]

The short answer to plaintiff's argument with respect to paragraph 10(c) is that nothing in paragraph 10(c) *expressly* limits the government's setoff rights or precludes the government from making repairs and deducting the cost of such repairs from rent due under the lease.  As explained *supra*, the absence of any explicit limitation on the government's common law setoff rights is dispositive of the issue of whether the government was entitled to replace the roof and deduct the cost of such replacement from rent.

The court's conclusion would be no different even if the court were to assume that the Postal Service's right to repair and deduct were a matter of contract interpretation as to the exclusivity of the remedies enumerated in paragraph 10(c) of the lease (*i.e.*, cancellation).  It is axiomatic that contract interpretation begins with the plain language of the agreement.  *E.g.*, *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (citation omitted).  Paragraph 10(c) states that "[i]f any building or any part of it on the leased property becomes unfit for use for the purposes leased, the lessor shall put the same in a satisfactory condition."  A8.  It then goes on to state that "[i]f the lessor does not do so with reasonable diligence, the Post Office Department *in its discretion may* cancel the lease."  *Id.* (emphasis added).  This permissive language clearly connotes non-exclusivity as to the remedies available to the Postal Service in the event of the lessor's failure to maintain the premises.  The plain language of

---

[8]/ Ensley also suggests that interpreting the lease to allow self-help repair and rent deduction would "render portions of the [lease] meaningless," thereby violating a basic canon of contract interpretation.  Pl.'s Resp. at 7 (citing *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997), *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996), and *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985)).  Defendant is correct to point out, however, that Ensley "fails to identify what provision of the lease, if any, is rendered meaningless" under the government's proffered interpretation.  Def.'s Reply at 8.  The court therefore rejects plaintiff's perfunctory, and unsupported, argument.

paragraph 10(c) therefore undermines Ensley's argument that the Postal Service's remedies were limited to cancellation of the lease.

Plaintiff's argument with respect to paragraph 10(c) is also in conflict with case law interpreting similar lease provisions.  "It is well settled that contracts to which the government is a party – and though a lease may concern and convey a property interest it is also very much a contract – are normally governed by federal law, not by the law of the state where they are made or performed." *Ginsberg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992) (citing *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986)).  When federal law does not answer the question presented, however, a court may "look to general property and contract law principles as they are embodied in state law pronouncements." *Id.* (citations omitted).

The parties do not cite, and the court has not found, any decisions of the Federal Circuit or this court (or their predecessors) involving similar lease provisions or addressing the exclusivity of remedies enumerated in Postal Service leases.  Nevertheless, the court notes that at least two federal district courts, in construing nearly identical provisions in Postal Service leases, have held that the enumeration of particular remedies for the lessor's failure to maintain the leased premises did not render those remedies exclusive of all remedies otherwise available to the Postal Service.  *See J&R Realty Co. v. United States*, 418 F. Supp. 391, 394 (E.D. Pa. 1976) (in an action by a lessor for recovery of rent withheld by the Postal Service as a setoff against the cost of repairs undertaken by the Postal Service, holding that "the government was justified in withholding from its rental payments the costs of . . . repairs determined to be necessary" notwithstanding a lease provision similar to paragraph 10(c)); *McClure v. United States*, 382 F. Supp. 988, 991-92 (D. Kan. 1974) (construing a lease provision identical to paragraph 10(c) in an action by a lessor for recovery of rent withheld by the Postal Service, and holding that the government "was not limited in remedies to an abatement of the rent or cancellation but could elect to make the repairs and deduct the expense from the rental payments").

Likewise, as the government points out in its briefs, the Postal Service Board of Contract Appeals, in construing similar lease provisions, has repeatedly held that the Postal Service may make repairs to leased buildings upon the lessor's failure to make necessary repairs and may recover the cost of such repairs through

rent deductions.  *See, e.g.*, *Spodek Nationwide Postal Mgmt. Lease Agreement*, PSBCA No. 4506, 02-1 BCA ¶ 31,733, 2001 WL 1647269 (Dec. 26, 2001) (construing similar lease provisions and upholding a contracting officer's decision requiring a lessor to reimburse the Postal Service for the cost of replacing a roof that persistently leaked despite previous repairs by the lessor because "those repairs did not relieve [the lessor] of the responsibility under the lease to maintain the facility (including the roof) in good repair and tenantable condition"), *aff'd sub nom Spodek v. Potter*, 57 F. App'x 867 (Fed. Cir. 2003); *Ester*, PSBCA No. 3051, 93-3 BCA ¶ 25,960, 1993 WL 106905 (Mar. 31, 1993) (in an action to recover rent withheld by the Postal Service under a lease requiring the lessor to maintain the leased premises, holding that the Postal Service was entitled to be reimbursed for the cost of repairs to the building's heating system); *M.R. Kaplan (Penner Fin. Grp.) Lease Agreements*, PSBCA No. 1147, 87-3 BCA ¶ 19,969, 1985 WL 17355 (Sept. 9, 1985) (in an action to recover rent withheld by the Postal Service under leases containing similar provisions to those at issue here, holding that "the absence of any lease provision restricting [the Postal Service's] use of its federal common law offset remedy to rentals due under the leases may be construed as permitting that remedy") (citation omitted); Def.'s Reply at 8.

The court also notes, as additional support for defendant's position, that at least two federal circuit courts of appeal, in construing state law, have held that contract provisions listing particular remedies for breach do not render the enumerated remedies exclusive absent an express limiting provision.  *See, e.g.*, *Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1362 (11th Cir. 2010) (concluding, under Georgia law, that a provision of an installment contract stating that the supplier could terminate or renegotiate the agreement if the purchaser "fail[ed] to order and pay for at least the minimum dollar amount of [p]roducts during any applicable period of time" did not effectively limit the supplier's remedies to the listed remedies because the contract did not clearly express that the listed remedies were exclusive); *Am. Nat'l Bank & Trust Co. of Chicago v. K-Mart Corp.*, 717 F.2d 394, 398 (7th Cir. 1983) (applying Illinois law to hold that "[t]he mere fact that a contract provides remedies a tenant may pursue on breach of a landlord's covenant does not necessarily limit the remedies available") (citation omitted); *cf. United States v. Paddock*, 178 F.2d 394, 396 (5th Cir. 1949) ("It is a generally recognized principle of law that remedies provided in a contract for breach of warranty are permissive only, and not exclusive unless so provided in the contract either expressly or by necessary implication.") (citations

omitted).  While these federal courts' interpretations of state law are not
dispositive, they are in harmony with both state law and respected treatises and,
accordingly, constitute additional persuasive authority in support of the
government's position in this case.  *See, e.g.*, *Marini v. Ireland*, 56 N.J. 130, 146
(1970) ("If . . . a landlord fails to make repairs and replacements of vital facilities
necessary to maintain the premises in a livable condition for a period of time
adequate to accomplish such repair and replacements, the tenant may cause the
same to be done and deduct the cost thereof from future rents."); 25 Richard A.
Lord, *Williston on Contracts* § 66:89, at 57 (4th ed. 2002) (citing various state
court decisions, as well as federal court decisions applying state law, for the
proposition that "[o]n the breach of a covenant by the landlord to repair, the tenant
may make the repairs himself or herself and recover the reasonable expense of
doing so").

> ### C. Whether the Government Was Entitled to Offset the Cost of Replacement against Real Estate Taxes Owed Pursuant to the Tax Clause

With respect to Ensley's allegation that the Postal Service breached the lease
by withholding property taxes required to be paid pursuant to the Tax Clause, the
government contends that "the terms of the [Tax Clause] unambiguously provide
that real estate taxes are payable to the lessor as rent," and therefore "in exercising
the Government's right to a setoff, the Postal Service did not breach the lease when
it chose to credit the real estate tax rent payments to offset the cost of the roof."
Def.'s Mot. at 17.  In addition, defendant argues that "even if the [Tax Clause] did
not state that the real estate taxes were payable as rent, the Postal Service still
would not have breached the lease because the lease does not preclude setoffs,"
including setoffs by means of withholding tax payments.  *Id.*

In response, Ensley argues that the express terms of the Tax Clause prohibit
the government from offsetting the cost of repairs against property tax payments.
*See* Pl.'s Resp. at 9-11.  The specific language upon which plaintiff relies is the
portion of the Tax Clause requiring the Postal Service to pay the lessor's property
taxes "by check made payable to the lessor and the taxing authority" and requiring
the lessor to "indorse said check and turn the same over to the said taxing
authority."  A16; *see* Pl.'s Resp. at 9-10.  Ensley suggests that the government is
precluded from setting off repair costs against tax payments because, pursuant to

the "clear language" of the Tax Clause, the taxing authority (not the lessor) "ends up with the funds." Pl.'s Resp. at 10. Additionally, and in the alternative, Ensley invokes the rule of *contra proferentem* to argue that, to the extent that the Tax Clause is found to be ambiguous, it "should be construed against the Defendant, who drafted the [T]ax [C]lause," because "the Plaintiff's interpretation of the [T]ax [C]lause is reasonable, and the Plaintiff has reasonably relied on its interpretation." *Id.* (citing cases).

The court finds Ensley's arguments with respect to the Tax Clause to be meritless, and agrees with defendant that the Postal Service was not precluded from withholding tax payments as a setoff against the cost of replacing the roof at Ensley Station. As an initial matter, the court has already determined that nothing in the lease expressly limits the government's setoff rights or precludes the government from making repairs and deducting the cost of such repairs from rent due under the lease. As defendant correctly notes, the Tax Clause requires the Postal Service to pay the lessor's property taxes as "*additional rent due hereunder*." A16 (emphasis added); *see* Def.'s Mot. at 17; Def.'s Reply at 13. By expressly including property tax payments as part of the "rent due" under the lease, the Tax Clause clearly permitted the government to offset the cost of repairs against tax payments to the same extent as with any other forms of rent.

Additionally, the court rejects the notion, advanced by Ensley, that the Postal Service was precluded from withholding tax payments as a setoff merely because the taxing authority, not the lessor, ultimately received the payments. Plaintiff offers no support for this argument other than to suggest that "[a]ll of the cases cited by the Defendant concerning the right to setoff" are distinguishable because, unlike in those cases, "[i]n this situation the lessor isn't actually getting the money." Pl.'s Resp. at 10. Plaintiff fails to explain how this distinction makes any difference with regard to the Postal Service's ability to invoke its setoff rights. Indeed, the plain terms of the lease undermine Ensley's position. The Tax Clause required the lessor to "present to the Government the general real estate tax bills . . . for taxes due and payable on the land and buildings hereby demised" and required the Postal Service to pay such bills "as additional rent." A16. Regardless of the ultimate recipient of the tax payments, this language plainly conferred a financial benefit to the lessor, and imposed a corresponding financial obligation upon the Postal Service, which could be offset against the cost of necessary repairs undertaken by the Postal Service.

21

Finally, the court agrees with defendant that "Ensley's invocation of the rule of *contra proferentem* is misplaced." Def.'s Reply at 14. As the Federal Circuit has held, "*contra proferentem* is a rule of last resort that is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted). A contract provision is ambiguous only if it is "susceptible to more than one reasonable interpretation." *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) (citing *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000)). The court has already determined that the Tax Clause, by expressly including property tax payments as part of the "rent due" under the lease, unambiguously permitted the government to offset the cost of repairs against tax payments to the same extent as with any other forms of rent. Ensley has failed to demonstrate any ambiguity in the Tax Clause which would support the invocation of *contra proferentem*.

## CONCLUSION

For all of the foregoing reasons, the court concludes that Ensley has failed to demonstrate a genuine issue of material fact as to the cause of the ongoing leaks at Ensley Station as well as its failure to remedy those leaks. Furthermore, the court concludes that, under the plain language of the lease, the Postal Service was entitled to offset the cost of replacing the leaky roof against rent due Ensley under the lease, including by withholding tax payments otherwise due under the Tax Clause. Defendant is therefore entitled to summary judgment on each of plaintiff's claims.[9]

Accordingly, it is hereby **ORDERED** that

---

[9]/ With regard to Ensley's request for an award of attorney fees in Count III of the complaint, the court notes that attorney fees may be awarded under the Equal Access to Justice Act only to a "prevailing party." 28 U.S.C. § 2412(d)(1)(A) (2012); *see, e.g.*, *360Training.com, Inc. v. United States*, 111 Fed. Cl. 356, 360 (2013) (citing *Comm'r, Immigration & Naturalization Serv. v. Jean*, 496 U.S. 154, 158 (1990)).

(1)    Defendant's Motion for Summary Judgment, filed August 29, 2013, is **GRANTED**;

(2)    The Clerk's Office is directed to **ENTER** final judgment in favor of defendant **DISMISSING** the complaint **with prejudice**; and

(3)    Each party shall bear its own costs.


/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge